RECEIVED
IN LAKE CHARLES, LA

AUG 27 2009

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| SAMUEL W. BAYNES<br>Plaintiff | : | CIVIL ACTION NO: 2:08-CV-1108 |
| VS. | : | JUDGE MINALDI |
| W. R. GRACE & CO.-CONN.<br>Defendant | : | MAGISTRATE JUDGE KAY |

**MEMORANDUM RULING**

Presently before the court is a Motion for Summary Judgment [doc. 10] filed by the defendant, W.R. Grace ("Grace"). The defendant, Samuel L. Baynes ("Baynes") filed an opposition [doc. 13]. Grace filed a reply [doc. 15].

In this suit, Baynes asserts claims against W. R. Grace under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §2000 *et seq*. He maintains he was terminated on the basis of his race and in retaliation for having engaged in activity protected by Section 704(a) of Title VII (¶2 and ¶11 of the Petition). Baynes alleges that termination on the basis of his race, was violative of the Civil Rights Act of 1866 as amended, 42 U.S.C. §1981. (¶11 of the Petition). Grace maintains that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law dismissing all of Baynes' claims.

**FACTS**

Grace operates a production facility in the Lake Charles area where it produces catalyst for petrochemical plants among other products. In 2006 approximately 300 employees worked at the facility. The individual in charge of the Lake Charles operation was, and still is, Operations Director David Rentrop. (Exb. 2, Rentrop depo., p. 7, L. 18-20). Rentrop was and is responsible for the

1

overall operation of the Lake Charles facility including its cost performance and its labor relations environment, overall production and environmental health and safety, and engineering and production quality. (Exb. 3, Vincent depo., p. 105, L. 7-9; Exb. 2, Rentrop depo., p. 8, L. 1-8).

In early 2006 Grace was interviewing candidates for the job of Western Regional Human Resource Manager. The individual hired would have human resource responsibilities throughout a multi-state region in which Grace operated approximately 11 separate plants, the largest of which was/is the Lake Charles plant. The individual to be hired would be stationed in Lake Charles and travel to the other locations on a "need" basis. He would be a "direct report" to Troy Vincent, Human Resource Manager, Americas, who was stationed in Columbia, Maryland. (Exb. 4, Johnson depo., p. 12, L. 2-12). The individual hired would be expected to work with the plant managers on the numerous H.R. matters that occurred frequently which impacted on plant operation.

The Western Regional Human Resource Manager position became available when the Lake Charles H.R. Manager Calvin Jaetzold announced his retirement. (Exb. 2, p. 11, L. 12-24). Grace originally offered the job to an African-American man who declined the offer. (Exb. 2, p. 10, L. 23-25; Exb. 4, Johnson depo., p. 37, L. 17-21). Interviews continued and eventually Operations Director Rentrop interviewed Baynes and recommended him for the position. (Exb. 2, p. 9, L. 21-25, p. 11, L. 9-11). Baynes then flew to Columbia, Maryland where he interviewed with Bernardine Johnson, who was then employed in the position of Vice President of Human Resources. Ms. Johnson, an African-American, recommended against hiring Baynes. She did not consider Baynes to be "authentic." (Exb. 4, p. 15, L. 7-16).

Baynes was then interviewed by Mr. Mike Piergrossi, who was Troy Vincent's boss, and by Troy Vincent. Piergrossi and Vincent decided to offer the job to Baynes and he accepted. (Exb. 3,

p. 16, L. 1-13). Baynes had an extensive background in manufacturing which impressed Vincent and led Vincent to conclude that Baynes had the experience and the capability to perform the job well. (Exb. 3, p. 16, L. 1-5). The job paid $100,000 per year.

Baynes reported to work at the Lake Charles facility in February 2006. During the first six weeks of his employment he had the benefit of working with his predecessor, Calvin Jaetzold. He was also provided an assistant, Ms. Chris Dutridge. (Exb. 1, p. 147, L. 17-25, p. 148, L. 1-6).

Within the first several months of employment with Grace, Baynes brought certain complaints that he believed to be violations of Title VII to the attention of Vincent and Johnson. (Exb. 1, p.73). Baynes testified that his interactions with Vincent during the term of his employment by Grace were extremely limited, much to the frustration of Baynes.

Grace asserts that, in April 2006 Troy Vincent became aware of a communication problem between Baynes and the management staff of the Lake Charles plant. By this time (April 2006) Vincent allegedly became aware that Baynes demonstrated a propensity to act without first consulting/counseling with the various management personnel whose area of responsibility was affected by Baynes' actions and decisions.

One of the initial communication problems of which Vincent allegedly became aware involved difficulties between the Lake Charles management and Baynes over the way Baynes handled a complaint from an employee about a pornographic picture discovered on a personal computer in the plant lab. Baynes received the complaint in April 2006 and promptly notified the IT (Information Technology) Department Manager Ben Garber and an investigation was launched. (Exb. 5, Garber depo., p. 14, L. 1-21). Garber's crew examined the computer on which a pornographic picture was discovered and examined the other 29 computers located in the lab. (Exb.

5, p. 31, L. 16-25).

Garber learned that the photograph was the only pornographic material present within the lab computers. The identity of the employee who had received the pornography from an outside source was discovered and the employee was disciplined. (Exb. 3, p. 35, L. 8-12). To protect against plant computers harboring pornographic materials, Garber implemented a system which caused material received into a plant computer from a source outside the plant to be "dropped" from the computer immediately after it was opened, reviewed, and closed. (Exb. 5, p. 19, L. 1-12). Garber testified that there was no way to block such material from being sent to a computer but the system that he installed would keep any pornogrphic material from being stored in the computer. (Exb. 5, p. 18, L. 14-17).

Baynes spoke to the workforce at safety meetings and warned against pornography being introduced into computers. (Exb. 1, p. 47, L. 10-21). Garber considered the check of all lab computers for pornography, the discipline of the employee who received the pornography and implementation of the plant wide system that caused such material to be "dropped" from the computer(s) immediately after it was received, opened, then closed to be a sufficient remedy of the single complaint.

Mr. Baynes wanted the IT Department to do more. (Exb. 5, p. 32, L. 1-6; Exb. 1, p. 45, L. 10-25). Baynes wanted all 210 plant computers to be checked to determine if similar materials existed in any other computers. (Exb. 5, p. 18, L. 18-25). When the IT Department personnel suggested to Baynes that Operations Manager Rentrop be advised of the disagreement Baynes replied that he (Baynes) did not report to Rentrop and there was no need for Rentrop to be advised of the situation. (Exb. 5, p. 32, L. 15-25; Exb. 2, p. 18-19). IT Department employee Chris Owens

4

disagreed with Baynes on this point and informed Rentrop about the problem. Owens also told Rentrop about Baynes statement to IT Department employees concerning Baynes not reporting to Rentrop and Rentrop not needing to know about the situation. (Exb. 2, p. 19, L. 18-22).

Within a few days of the complaint of pornography being received and investigated, a meeting was attended by Baynes, Rentrop, and IT Department Manager Garber. Baynes maintains he urged Rentrop to have all computers checked but Rentrop never responded to Baynes. (Exb. 3, p. 45, L. 16-25, p. 46, L. 1-16). Rentrop and Garber testified that when Garber, Rentrop, and Baynes met, Baynes seemed to agree with Garber that the "fix" by the IT Department was sufficient. (Exb. 2, p. 20, L. 22-25, p. 21, L. 1-5; Exb. 5, p. 20, L. 24-25, p. 21, L. 1-25, p. 22, 1-3).

Rentrop was upset about Baynes telling employees that he (Baynes) did not report to Rentrop and need not include Rentrop "in the loop" in regard to the existence of the complaint and investigation of pornography in the workplace. (Exb. 2, p. 23, L. 10-16, p. 27, L. 3-6). This was particularly upsetting to Rentrop because another employee, Ms. Chris Dutridge (Baynes' assistant) reported to Rentrop that
Baynes made a similar remark to accounts payable employees when a clerk was being hired in the accounts payable department. (Exb. 2, p. 23, L. 17-21, p. 24, L. 1-15).

Rentrop was allegedly troubled by the reports he received from Chris Owens (IT Department employee) and Chris Dutridge (Baynes' assistant) that Baynes was telling employees that he (Baynes) did not have to inform Rentrop of such situations (the pornography incident, the hiring of an accounts payable clerk). Rentrop discussed the matter with Baynes. Rentrop then also reported Baynes' comments to Vincent. (Exb. 3, p. 31, L. 14-17). The date on which Rentrop spoke to Baynes about making such remarks was on or about April 20, 2006. (see Exb. 2 to Vincent's depo, Exb. 3,

5

the termination letter stating that Rentrop and Baynes met on April 20, 2006).

Grace asserts that because Vincent had received complaints about Baynes even before he received the complaint from Rentrop, Vincent decided to travel to Lake Charles on April 27, 2006 and meet with Baynes to discuss the communication difficulty which surfaced during the investigation into pornography (Exb. 3, p. 31, L. 4-17) as well as the other problems. Vincent explained that another problem was caused by Baynes' written communication to Grace's CEO concerning the availability of raw material. The problem with the written communication involved Baynes not informing Vincent about his correspondence to the CEO. When the CEO asked Vincent questions about the correspondence Vincent was not familiar with the subject. (Exb. 3, p. 30, L. 1-21, p. 31, L. 1-4). Additionally Vincent had received other complaints about Baynes which he intended to discuss with Baynes. (Exb. 3, p. 40-41).

During the April 27, meeting Baynes was advised by Vincent that he was not satisfied with Baynes performance and that improvement was necessary if Baynes intended to remain in the position. (Exb. 3, p. 43, L. 11-20). Baynes denies that any such warning was given. (Exb. 1, p. 172). Vincent implemented a performance improvement program which consisted of scheduled telephone communication (Exb. 3, p. 46, L. 10-13) between Vincent and Baynes during which Baynes performance would be discussed, critiqued and counseling would be provided if needed. (Exb. 4, Johnson depo., p. 24, L. 14-15; Exb. 3, p. 114, L. 16-21). Baynes denies that he was ever placed in such a program. (Exb. 1, p. 178-179). The program was scheduled to run 60 days but this was an informal time period and Vincent chose not to bring the program to a conclusion at the end of 60 days. Rather he extended the sixty days and continued to counsel with Baynes. Vincent hoped for improvement and that Baynes would remain employed. (Exb. 3, p. 92, L. 4-21).

Baynes asserts that, prior to the August 2006 meeting, he had never received a call from Vincent in which he was informed that his job performance was poor or that his job was in jeopardy. ( (Exb. 1, pp. 26-28, 77, 83, 178-179). Baynes asserts that he was never told that he was on a "performance improvement plan," nor did he schedule or have regular phone calls with Vincent. (Exb. 1, pp. 178-179). Baynes testified that he never received any document evidencing any performance issues. (Exb. 1, p.59). Despite Vincent's assurance that he would meet with Baynes to discuss goals and objectives for his position, that meeting never occurred. (Exb. 1, p.26-27). Baynes asserts that Vincent never documented Baynes' performance deficiencies. (Exb. 3, p.69).

Grace alleges that Baynes' performance problems continued and on August 9, 2006 Vincent traveled to Lake Charles, met with Baynes, and informed him that his employment was terminated. (Exb. 3, p. 109, L. 16-20). Baynes testified that he never received a copy of the August 9, 2006 termination letter listing the reasons for termination. (Exb. 1, p.130).

Prior to his August 9, 2006 termination meeting with Baynes, Vincent prepared notes on the incidents and circumstances he would identify to Baynes as the mistakes, misjudgments, and miscommunications Baynes made which led to his termination. (Exb. 3, p. 110, L. 3-8). These notes, which Vincent used during the meeting, are Exhibit 1 to Vincent's deposition, Exb. 3. Vincent gave detailed testimony about what he said to Baynes in regard to each item listed in his notes. These notes itemized Baynes' recurring performance problems and mistakes. The fact that Baynes offered an excuse for each occurrence caused the meeting to be lengthy (Exb. 3, p. 110, L. 12-17).

Most of the incidents listed in Vincent's notes occurred shortly before or during the job improvement performance program which began on April 27, 2006. Among the items listed and testified to by Vincent were the disagreement Baynes had with the Grace IT Department personnel

over the investigation into the pornography incident, a written communication to the Grace CEO about which Baynes should have notified Vincent before sending the communication and an incident involving Baynes not communicating with Operations Director Rentrop on matters about which he (Rentrop) should have been advised. Bernardine Johnson described Baynes' response to the counseling she provided to Baynes on his lack of communication with Rentrop as non- receptive, Exb. 4, p. 19, L. 11-21, p. 20, p. 21, L. 1-3, p. 24, L. 3-16). "He (Baynes) reiterated that he didn't report to David and that he did not feel obligated or obliged to inform David of everything that was going on, and he was - - did not accept my - - did not readily accept my feedback." (Exb. 4, p. 24, L. 5-9). Problems addressed included Baynes terminating an employee who should not have been terminated which resulted in the employee being reinstated (Exb. 3, p. 52-53, L. 4-16; also see Exb. 1 to Exb. 1 letter of termination to employee Delphin and Exb. 2 to Exb. 1, letter to Delphin retracting termination), the termination of an employee in Houston without informing the manager of the termination (Exb. 3, p. 57, L. 1-21, p. 58, L. 1-8), Baynes missing an important planning meeting (p. 71-72), Baynes conducting job interviews in Houston and asking job candidates inappropriate questions about drug issues and credit ratings (Exb. 3, p. 77, L. 12-21, p. 78, L. 1-21, p. 79, L. 1-21), Baynes' manner of questioning management personnel about overtime payments to certain groups of employees (p. 80- 83), Baynes removing job qualification criteria from a job description causing unqualified individuals to be interviewed and considered for jobs (Exb. 3, p. 85, L. 8-21, p. 86, L. 1-9, p. 88, L. 1-10), Baynes addressing a female employee as "Momma" (Exb. 3, p. 86, L. 14-21) (admitted by Baynes, Exb. 1, p. 181, L. 15-18).[1]

---

[1] There are other mistakes and errors in judgment listed on Exb. 1 to Vincent's deposition which were covered in the August 9 meeting(see Exb. 3, p. 89, L. 14, 21, p. 90, p. 91, p. 98, L. 16-21, p. 99, L. 1-8, p. 99, L. 12-21, p. 100, L. 1-15, p. 101, L. 8-12, p. 102, L. 1-21, p.

Grace asserts that the decision to terminate was not based on any one of these many occurrences; rather it was the result of the recurrence of such incidents and the lack of improvement. (Exb. 3, p. 70, p. 71, L. 1-5). Vincent explained that he expected a much better performance from someone with such a long history of employment in manufacturing facilities, "... the reason I hired him was because of his great experience ..." (Exb. 3, p. 112, L. 17-18). When it became obvious there would be no improvement, and that problems of the same nature were recurring, he decided to terminate Baynes. Vincent testified that the decision to terminate Baynes was based on the ongoing recurring communication problem and the exercise of bad judgment. The recurring communication problems were both verbal and written. In fact early in his employment Bernardine Johnson informed Baynes that his e-mails and memos had to improve. Johnson testified that Baynes had basic sentence structure, grammar, and spelling problems. (Exb. 4, p. 27, L. 1-20). In this regard Baynes' three page letter to the EEOC dated March 18, 2008 (Exb. 1 to Rentrop's deposition, Exb. 2) provides an example of Baynes' poor writing. When Vincent asked Johnson her opinion on terminating Baynes she "... supported the termination." (Exb. 4, p. 25, L. 6-13).

Vincent testified that Baynes' race had nothing to do with the decision to terminate. (Exb. 3, p. 124, L. 4-16). Vincent testified that Baynes' difference of opinion as to the extent of the investigation into the pornography complaint, Baynes questions to Vincent about the hiring of a Caucasian permanent employee to replace an African-American temporary employee and the incident involving the complaint about a convenient parking place being provided to pregnant employees did not factor into Vincent's decision to terminate Baynes. (Exb. 3, p. 126-128).

---

103, L. 1-21, p. 104, p, 105, p. 107, L. 12-20).

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgment by identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden. *Id.*

If the movant satisfies this burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Celotex*, 477 U.S. at 323). In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no genuine issue for trial, and thus a grant of summary judgment is warranted, when the record as a whole "could not lead a rational finder of fact to find for the non-moving party. . . ." *Id.*

## LAW AND ANALYSIS

Baynes has claimed discrimination based upon race and retaliation. Under Title VII, a plaintiff may prove discrimination or retaliation either by direct or circumstantial evidence. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). Where a plaintiff produces direct evidence of discrimination, he is "entitled to bypass the *McDonnell Douglas* burden-shifting framework commonly applied in discrimination cases and proceed directly to the question of liability." *Moore*

10

*v. U.S. Dep't of Agric.,* 55 F.3d 991, 995 (5th Cir. 1995). "In such 'direct evidence' cases, 'the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor.'" *Stone v. Parish of East Baton Rouge,* 2009 WL 2169122, 2 (5th Cir. 2009); *Fierros v. Tex. Dep't of Health,* 274 F.3d 187, 192 (5th Cir. 2001) (quoting *Brown v. E. Miss. Elec. Power Ass'n,* 989 F.2d 858, 861 (5th Cir.1993)).

A case built on circumstantial evidence, like this one, is analyzed pursuant to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *McCoy,* 492 F.3d at 556. Thus, in order to maintain an action for discrimination, the plaintiff must make a prima facie showing that: (1) he is a member of a protected class; (2) he was qualified for the job he held; (3) he was discharged; and (4) he was replaced by someone who was not in the protected class. In order to maintain an action for retaliation, a plaintiff must make a prima facie showing that: (1) he participated in an activity protected by Title VII, (2) his employer took an adverse employment action against him[2], and (3) a causal link exists between the protected activity and the adverse employment action. *Banks v. E. Baton Rouge Parish Sch. Bd.,*

---

[2] *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53 (2006), the Supreme Court changed the definition of "adverse employment action" for Title VII retaliation cases. In place of the "ultimate employment decision" standard, the Court now only requires a plaintiff to show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 126 S.Ct. at 2415 (internal quotations omitted). *See also Donaldson v. CDB Inc,* 2009 WL 1916466, 12 ( 5th Cir. 2009).

320 F.3d 570, 575 (5th Cir. 2003). If the plaintiff is able to establish a prime facie case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the employment action. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002). If the employer meets this burden of production, the plaintiff must then prove that the employer's proffered reason is a pretext for an actual, retaliatory, purpose. *McCoy*, 492 F.3d at 557.

While Baynes' deposition testimony provides accounts of certain events which differ from the accounts tendered by the defendant's witnesses, the question becomes whether these differences create material issues of fact which prohibit summary judgment. For the reasons stated below, the court finds that these difference do not create material issues of fact which prohibit summary judgment.

The new standard announced by *Burlington Northern* cannot save Baynes' retaliation or race discrimination claim, which are fatally flawed on other, independent grounds. First, Baynes has introduced no competent summary judgment evidence of discrimination based upon race. He directs the court to no testimony which supports this allegation. Second, many of the actions Baynes complains of cannot be retaliatory because they are not based upon his participation in any protected activity. Baynes asserts that when he urged Ben Garber to check all the plant computers for pornography because if pornography became prolific on the plant computers, this would create a hostile work environment in violation of Title VII (Exb. 3, p. 123, L. 3-15), he was engaged in protected activity. Baynes contends that because Vincent cited Baynes' handling of the "porn incident" during the termination meeting, it follows that his termination, at least in part, was in retaliation for the "protected activity" of urging Garber to check the computers. The disagreement with Garber over checking the plant computers is not protected activity under Title VII, and

therefore cannot serve as grounds for a Title VII retaliation action.

Baynes also argues that his termination was in retaliation for his insistence on investigating a complaint from a male employee about preferential parking given to pregnant women. Rentrop told Baynes not to pursue the complaint as the employee was not serious. Baynes did not drop the matter, but sought an opinion from corporate counsel. Baynes told Rentrop that he would not drop the matter. Approximately thirty minutes after this exchange, Baynes received a telephone call from Vincent saying that he would be in Lake Charles in a few days and they would discuss the matter. Three days later they met and Baynes was terminated. Baynes alleges that Vincent cited this incident in support of termination. Vincent denies this.

Baynes claims that the complaint from the male employee was a Title VII matter since it raised the issue of sex discrimination. Baynes asserts that when he refused to drop the matter as instructed by Rentrop, he was engaged in protected activity. Although the court was unable to locate any cases in which a party allegedly discriminated by giving pregnant women privileges, an analogy can be drawn to *California Federal Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272 (U.S.Cal.,1987), a case which discussed the Pregnancy Discrimination Act. The United States Supreme Court held in that case that the Pregnancy Discrimination Act, which provides that discrimination on the basis of pregnancy is sex discrimination under Title VII, does not prohibit employment practices that *favor* pregnant women. (Emphasis added). Civil Rights Act of 1964, §§ 701 et seq., 701(k), as amended, 42 U.S.C.A. §§ 2000e et seq., 2000e(k). The fact that Baynes was investigating charges of alleged discrimination because pregnant employees were given closer parking spaces is not protected activity under Title VII, therefore cannot serve as grounds for a Title VII retaliation action.

Baynes also asserts that his questioning the replacement of a temporary African-American worker with a permanent Caucasian worker was protected activity for which he was terminated. Baynes asserts that he questioned Vincent, but never received an answer. Vincent testified that he explained to Baynes that when the Lake Charles plant received authorization to make the position permanent, the job was posted internally, in keeping with past practices. (Exb. 3, pp. 115-117). Vincent testified that this conversation had nothing to do with the termination. (Exb. 3, p. 126). Although Baynes asserts that Vincent never responded to his question, there is evidence that Baynes knew of this practice because he used this same practice to fill vacancies in Colorado. (Exb. 1, p. 177).

Baynes complains that he was the only Human Resources Manager that was required to prepare reports for the Manager of Operations, David Rentrop. (¶6 Complaint). In his testimony Baynes did not clarify whether he was alleging that this requirement constituted race discrimination or retaliation. (Exb. 1, p. 98, L. 1-2). Baynes testified that he complained about this requirement to Vincent. Vincent advised him that this was a good way for Rentrop to stay apprised of what was happening in the Human Resources Department . (Exb. 1, p. 95). Baynes also testified that his predecessor, Calvin Jaetzold, also provided similar reports to Rentrop. (Exb. 1, p. 168). This is not evidence of race-based discrimination nor retaliation.

Baynes alleges that Rentrop terminated African-American employees on the basis of their race, and refused to place African-American employees into positions with promotional opportunities. (¶7 Complaint; Exb. 1, p. 101). Baynes provided "Veronica" as an example. Baynes approached Rentrop and asked if Veronica could be offered another position rather than be terminated and Rentrop agreed. He offered Veronica another position, which she declined. (Exb.

1, p. 102-103). This example provides no competent summary judgment evidence that Rentrop terminated anyone because of race. (Exb. 1, p. 106).

It is clear from the evidence that Baynes has not presented a prima facie case of retaliation. He did not establish that he was engaged in any activities protected by Title VII. Accordingly, summary judgment will be grated on this claim.

In considering discharge based upon race, Baynes has established that he is African-American, he was initially considered qualified for the job, he was terminated, and a Caucasian was hired as his replacement, establishing a prima facie case of race discrimination. Grace has also established a legitimate, non-discriminatory reason for the employment action. Baynes did not dispute that he inappropriately questioned job applicants about drug use and credit history, that he referred to another employee as "momma," that he was responsible for the wrongful termination of an employee named Delphin and that he had communication problems with Rentrop. Baynes did not deny that any of the events occurred, he merely offered justifications for his actions. The burden then shifts back to Baynes to establish pretext. Baynes argues that the lack of documentation of the performance improvement plan is evidence of pretext, yet Baynes introduced no evidence of a corporate policy that required progressive discipline leading to termination. *Bugos v. Ricoh Corp.*, 2008 WL 3876548, 5 (5th Cir. 2008).

Ordinarily, the plaintiff would have the opportunity to discredit the defendant's proffered explanations for its decision to terminate the plaintiff. The plaintiff's averment that the defendant discriminated against him on the basis of his race, however, has no support in the record. Moreover, federal courts "do not sit as a super-personnel department that reexamines an entity's business

decisions." *Chapman v. AI Transp. et al.*, 229 F.3d 1012, 1030 (11th Cir.2000) (quoting *Elrod v. Sears. Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991)). It is not appropriate for either the plaintiff or this court to "recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer." *Chapman*, 229 F.3d at 1030. An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Dickinson v. Springhill Hospitals, Inc.*, 397 F.Supp.2d 1337, 1346 (S.D.Ala.,2005) *citing Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984). Baynes offered no competent summary judgment evidence of pretext sufficient to defeat summary judgment on this issue.

There is no material issue of fact that precludes summary judgment. Accordingly, summary judgment will be granted.

Lake Charles, Louisiana, this 27 day of August, 2009.

PATRICIA MINALDI
UNITED STATES DISTRICT COURT